[Cite as *Montefiore Home v. Fields*, 2021-Ohio-3734.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

MONTEFIORE HOME,       :

    Plaintiff-Appellant,    :

                           No. 110183

    v.                    :

FAYE FIELDS,          :

    Defendant-Appellee.   :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 21, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-878371

---

### *Appearances:*

Rolf Goffman Martin Lang, L.L.P., David S. Brown, and W. Cory Phillips, *for appellant.*

Sam Thomas, III, Esq. & Associates, L.L.C., and Sam Thomas, III, *for appellee.*

SEAN C. GALLAGHER, P.J.:

{¶ 1} Plaintiff-appellant The Montefiore Home ("Montefiore" or "Plaintiff") appeals the judgment of the trial court that found in favor of defendant-appellee Faye Fields ("Fields" or "Defendant") on all claims raised in the complaint. Upon review, we affirm the judgment of the trial court.

**Background**

{¶ 2} We adopt the statement of the case and the statement of the facts set forth in the trial court's opinion, which is supported by the record herein and provides as follows:

STATEMENT OF THE CASE

This action commenced on April 4, 2017, when Plaintiff The Montefiore Home filed its Complaint against Defendant Faye Fields (now known as Faye Henderson) for the following claims: promissory estoppel, fraudulent transfer, and statutory cause of action under O.R.C. 1337.092(B). Plaintiff's Complaint seeks an award of compensatory damages in the amount of $20,388.34 as to each count of the Complaint, plus interest, attorney's fees and costs.

The case proceeded to an arbitration on March 26, 2018, and an award was entered in favor of Defendant on all counts. Plaintiff appealed the arbitration award, and the case was reinstated to the Court's docket. Thereafter, on May 23, 2018, the Court granted Defendant's motion for summary judgment, filed September 7, 2017. Plaintiff appealed, the Court's ruling was reversed, and the case was remanded for further proceeding. Upon remand, the Court issued a new scheduling order. Plaintiff moved for summary judgment on December 4, 2019 as to all counts. Defendant filed no opposition, and the motion was granted on January 14, 2020.

Thereafter, Defendant obtained counsel and moved to set aside the judgment against her, which this Court did on March 2, 2020. A bench trial was held on October 22, 2020. The parties and witnesses appeared virtually over Zoom. The Court heard testimony from Melanie Alberts, Leah Rotenberg, and Defendant. At trial, Plaintiff

sought an award of compensatory damages in the amount of $22,941.11 plus interest at the rate of 12 percent per annum and attorney's fees. * * *.

## STATEMENT OF FACTS

On June 12, 2014, non-party Hazel Thornton was admitted as a resident at Montefiore's skilled nursing facility. Thornton executed the Admission Agreement admitted as Plaintiff's Exhibit 3 during trial. Defendant's name appears on the Agreement as Thornton's "representative," but there is no dispute that Defendant is not contractually liable for the debt. Around the time of her admission, Defendant, who was Thornton's goddaughter, became Thornton's power of attorney. As Thornton's power of attorney, Defendant assisted Thornton while she remained at Montefiore by bringing her any mail delivered to Thornton's home, managing errands, and occasionally serving as a contact with Montefiore to discuss Thornton's billing.

Plaintiff billed Thornton's care on a monthly basis, and delivered monthly statements to Thornton at Defendant's attention, which Defendant then brought to Thornton. Leah Rotenberg, Plaintiff's Controller, testified to the various charges and credits assessed to Thornton's account related to her care. Thornton was approved for Medicaid beginning June 1, 2014, which dictated the amount she would be billed for Plaintiff's services. Thornton's patient liability, as determined by Medicaid, was $2,246 per month from June 2014 - July 2015, and $2,355 per month from July 2015 - August 2016.

During the course of her care at Montefiore, Thornton made several payments to Plaintiff, totaling $11,300. In August 2015, Defendant persuaded Thornton to direct her Ohio Public Employees Retirement System (OPERS) pension and social security payments to be sent directly to Plaintiff. Plaintiff began receiving Thornton's OPERS and social security payments in October 2015. As reflected in Plaintiff's Exhibit 7, after accounting for all voluntary, OPERS, and social security payments credited to Thornton's account, Thornton had an outstanding balance with Plaintiff of $22,294.11 at the time of her death on August 14, 2016.

While serving as Thornton's power of attorney, Defendant assisted with her banking needs, including making account withdrawals and transfers at Thornton's instruction and for Thornton's use. Specifically, on June 16, 2015, Plaintiff and Defendant had a discussion wherein Defendant indicated that a $4,000 payment would

be dropped off at the facility. Defendant withdrew the $4,000 as directed by Thornton, delivered it to Thornton, but then was instructed by Thornton to redeposit the funds to her account.

When Defendant prepared a withdrawal from Thornton's account, she would usually try to have Thornton sign the withdrawal slip, but occasionally would make withdrawals without Thornton's signature. The evidence revealed some withdrawals from Thornton's bank account that correlate directly with payments made to Plaintiff, and others that did not. Defendant testified that other cash withdrawals, for which she does not have receipts, were made at Thornton's direction and for Thornton's benefit, and Defendant did not use any of Thornton's money for personal use. In total, $18,389 in withdrawals or transfers were made from Thornton's bank account for which Defendant did not have receipts, but testified were made at Thornton's direction. Plaintiff did not present evidence otherwise. Following Thornton's death, Defendant covered all of Thornton's funeral expenses personally, in the amount of $7,000.

{¶ 3} After considering the testimony and evidence presented at trial, the trial court found against Montefiore on all claims. This appeal followed.

**Law and Analysis**

{¶ 4} Montefiore raises three assignments of error for our review.[1] Under the first assignment of error, Montefiore claims the trial court erred in finding it failed to prove by a preponderance of evidence Counts II and III of the complaint. Montefiore argues that it was previously determined that Fields admitted to averments in the complaint by failing to specifically deny allegations. Montefiore maintains that the trial court erred by failing to construe the averments under Counts II and III as admitted under Civ.R. 8(D).[2]

---

[1] Montefiore has not challenged judgment in favor of Fields on the promissory estoppel claim on appeal.

[2] Although Fields argues Montefiore waived this argument because it does not challenge rulings made in relation to Montefiore's motions for summary judgment, the

{¶ 5} The record shows that after the case was referred to arbitration, which was decided in favor of Fields, the trial court granted Fields's pro se motion for summary judgment. On appeal to this court, the summary judgment ruling was reversed. *Montefiore Home v. Fields*, 8th Dist. Cuyahoga No. 107359, 2019-Ohio-1989. The panel determined that Fields failed to meet her initial burden of proving she was entitled to summary judgment on the claims. *Id.* at ¶ 1, 24. In outlining the procedural history, the panel observed that Fields had admitted "the basic outline of Plaintiff's Complaint" with several exceptions that were made, but stated in dicta that "[b]y virtue of Fields' failure to specifically deny the *other averments* in the complaint, she thereby admitted them." (Emphasis added.) *Id.* at ¶ 7, citing Civ.R. 8(D) and *State ex rel. Craig v. Scioto Cty.*, 117 Ohio St.3d 158, 2008-Ohio-706, 882 N.E.2d 435, ¶ 20. The panel did not, as Montefiore suggests, find that Fields admitted the averments included in Counts II and III of the complaint. Under the legal analysis pertaining to the summary judgment ruling, the panel commented upon evidence presented by Montefiore in support of its claims and determined Fields presented limited arguments in support of her motion and "offered no affidavit or evidence" to support arguments made in her motion. *Id.* at ¶ 16-22. As a result, the court found that Fields had not met her initial burden to establish no genuine dispute of material fact as to each claim, that "Fields entirely failed to address Montefiore's second and third causes of action," and that a conclusory

transcript reflects that Montefiore argued at trial that Fields had admitted averments included in Counts II and III of the complaint by failing to specifically deny them.

assertion was insufficient to satisfy her burden on summary judgment.  *Id.* at ¶ 19-23.  We also note that the decision was limited to reviewing the evidence presented with regard to the motion for summary judgment, and the court did not, nor could it, evaluate testimony and evidence later introduced at trial.

{¶ 6}  After remand, an unopposed motion for summary judgment filed by Montefiore was granted; however, the trial court granted a motion to set aside that ruling and denied a second motion for summary judgment filed by Montefiore upon determining "there are genuine issues of material fact and [Montefiore] is not entitled to judgment as a matter of law."[3]  The case proceeded to trial, and upon the testimony and evidence presented, the trial court granted judgment in favor of Fields on all claims.  The trial court made findings regarding each claim and determined that Montefiore failed to prove each claim by a preponderance of the evidence.

{¶ 7}  Montefiore argues that the trial court erred by finding it had not proven its claims by a preponderance of the evidence because, as observed in the prior appeal, Fields admitted "other averments in the complaint" by failing to specifically deny them.  *See id.* at ¶ 6.  However, as recognized in that decision, Fields admitted "the basic outline" of the complaint with exception.  *Id.* at ¶ 6.

{¶ 8}  Pursuant to Civ.R. 8(D), "[a]verments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are

---

[3] In moving to set aside the initial ruling, Fields argued, in part, that she had not been properly served, was not given a full opportunity to be heard, and had not admitted to the crux of Montefiore's allegations.

admitted when not denied in the responsive pleading."  However, this rule must be read in conjunction with the remaining sections of Civ.R. 8.  *Peppertree Farms, L.L.C. v. Thonen*, 2020-Ohio-3042, 154 N.E.3d 644, ¶ 58 (5th Dist.).  Civ.R. 8(B) provides that "[a] party shall state in short and plain terms the party's defense to each claim asserted and shall admit or deny the averments upon which the adverse party relies," and that the pleader has the option "to make the denials as specific denials" or "the pleader may generally deny all the averments except the designated averments * * * the pleader expressly admits * * *."  Additionally, Civ.R. 8(F) states that "[a]ll pleadings shall be so construed as to do substantial justice."  As explained in the staff notes, "Rule 8(F) emphasizes the fact that pleadings shall be construed liberally in order that the substantive merits of the action may be served."  Staff Notes to Civ.R. 8(F).  As recognized by the Ohio Supreme Court, "[t]he spirit of the Civil Rules is the resolution of cases upon their merits, not upon pleading deficiencies."  *Peterson v. Teodosio*, 34 Ohio St.2d 161, 175, 297 N.E.2d 113 (1973).

{¶ 9}  In this case, the complaint included a number of factual allegations pertaining to Hazel Thornton ("Thornton"), who is now deceased, including her admission to the skilled nursing facility and the admission agreement, the provision of health care, services, supplies, and room and board to Thornton, monthly invoices showing an accruing balance, and Thornton's failure to pay as reasonably anticipated.  The complaint proceeds to include allegations attributing liability to Fields.  Montefiore alleged that Fields had promised to pay or to arrange for payment for health care, services, and supplies provided to Thornton; to sell

Thornton's real estate in order to pay for the services provided; and to provide cash payments that were never received and then seek Medicaid coverage. Montefiore further alleged that after Thornton was admitted to its facility, Thornton fraudulently transferred real and/or personal property to Fields for zero consideration. Also, Montefiore alleged Fields, as Thornton's attorney in fact, failed to properly manage the financial affairs and pay the debts of Thornton. Upon these and related factual allegations, Montefiore raised claims against Fields for promissory estoppel, fraudulent transfer, and a statutory cause of action under R.C. 1337.092(B). Montefiore claimed that it had been damaged in the amount of $20,388.34.

{¶ 10} Fields filed a pro se answer to the complaint in which she only admitted to "the basic outline" of the complaint with exception, stating as follows:

> 1. Admits the basic outline of Plaintiff's Complaint with the following exception:
>
> 2. Defendant was merely the emergency contact person for her Godmother, Hazel Thornton and that in no way either verbally or in writing whatsoever did Defendant obligate herself for the debt which is the subject of this Complaint.
>
> 3. Moreover, Plaintiff's own Exhibit substantiates this in that the document does not show that the Defendant signed the Agreement.
>
> 4. Defendant further states that the property mentioned in Plaintiff's Complaint was foreclosed upon and funds derived from the sale.

{¶ 11} Upon denying any verbal or written obligation for the debt of Thornton and averring that the property was foreclosed, as opposed to fraudulently transferred, Fields moved to dismiss the complaint in her answer.

{¶ 12} Mindful that Fields's answer must be liberally "construed as to do substantial justice," it is apparent from her answer that Fields opposed the claims against her, denied liability, and requested the dismissal of the complaint. *See* Civ.R. 8(F). The answer is sufficient to comply with Civ.R. 8 and constitutes a denial of the averments underlying Montefiore's claims for relief. *See Peppertree Farms,* 2020-Ohio-3042, 154 N.E.3d 644, at ¶ 60 (finding answer that disagreed with counterclaims sufficiently complied with Civ.R. 8 and constituted a denial of the allegations in the counterclaims); *Karras v. Karras*, 2018-Ohio-515, 107 N.E.3d 74, ¶ 24 (2d Dist.) (rejecting a claim that an answer did not satisfy Civ.R. 8(B) upon finding "Appellee's denial of owing Appellant any 'rent and damages' constitutes a denial of the allegations in Appellant's second claim for relief."); *see also Highland Cty. Bd. of Commrs. v. Fasbender*, 4th Dist. Highland No. 98CA24, 1999 Ohio App. LEXIS 3565, 17-18 (July 28, 1999) (finding trial court unreasonably refused to treat a pro se affidavit as an answer, and even in the absence of specific denials, it was clear that the defendant opposed the action and intended to defend against the claim).

{¶ 13} Finding no error occurred, we overrule the first assignment of error.

{¶ 14} Under the second assignment of error, Fields argues the trial court erred in finding Montefiore failed to prove its claim for fraudulent transfer.

{¶ 15} In reviewing a civil appeal from a bench trial, this court applies a manifest weight standard of review. *Mathews v. Cooper*, 8th Dist. Cuyahoga No. 109974, 2021-Ohio-2768, ¶ 66, citing *United States Bank Natl. Assn. v.*

*Robinson*, 2020-Ohio-32, 150 N.E.3d 1262, ¶ 8 (8th Dist.). When reviewing the manifest weight of the evidence, the reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, [the trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The standard set forth in *Thompkins* applies in civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17.

{¶ 16} Count II of Montefiore's complaint raised a claim of fraudulent transfer in violation of R.C. 1336.04(A)(1), or alternatively sections R.C. 1336.04(A)(2) and 1336.05(A).

{¶ 17} R.C. 1336.04, entitled "When transfer or obligation incurred is fraudulent as to a creditor," provides,

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:
>
> (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(B) In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer or obligation was disclosed or concealed;

(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the assets of the debtor;

(6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

{¶ 18} R.C. 1336.05, entitled "Creditors whose claims arose before the transfer made or obligation incurred," provides as applicable to this matter,

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the

obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

{¶ 19} R.C. 1336.01(L) defines "Transfer" to mean "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Pursuant to R.C. 1336.06(A)(1)(b), "[a] transfer is made * * * [w]ith respect to an asset that is not real property * * * when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under [R.C. Chapter 1336] that is superior to the interest of the transferee." R.C. 1336.02 instructs that "[a] debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at fair valuation" and that "[a] debtor who generally is not paying his debts as they become due is presumed to be insolvent."

{¶ 20} "Ohio's Uniform Fraudulent Transfer Act, as set forth in R.C. Chapter 1336, was enacted to create a right of action for a creditor to set aside an allegedly fraudulent transfer of assets." *Yoo v. Ahn*, 8th Dist. Cuyahoga No. 105406, 2018-Ohio-1291, ¶ 11, citing *Sanderson Farms, Inc. v. Gasbarro*, 10th Dist. Franklin No. 01AP-461, 2004-Ohio-1460, ¶ 41. "[T]he issue concerning fraudulent intent is to be determined in view of the facts and circumstances of each case" and "[t]he burden of proof in an action to set aside a fraudulent conveyance must be affirmatively satisfied by the complainant." *Stein v. Brown*, 18 Ohio St.3d 305, 308, 480 N.E.2d 1121 (1985), citing 37 American Jurisprudence 2d 872-873, Fraudulent

Conveyances, Section 216 (1968); and 51 Ohio Jurisprudence 3d 96-98, Fraud and Deceit, Section 236 (1984). Due to the difficulty in finding direct proof of fraud, courts look to inferences that can be made from the surrounding circumstances. *Id.* at 308-309. Upon proof of a fraudulent transfer, judgment may be entered against the original transferee, as well as any subsequent transferee other than a good faith transferee, for the value of the asset transferred or the amount necessary to satisfy the creditor's claim, whichever is less. R.C. 1336.08(B)(1)(a) and (b).

{¶ 21} In this case, the testimony and evidence presented demonstrated that Thornton was admitted to the skilled nursing facility on or about June 12, 2014, and she died on August 14, 2016. Thornton went into the nursing facility for rehab and was described as being "so independent for so long."

{¶ 22} The total patient liability was a little over $36,000, and monthly statements were mailed to Fields and given to Thornton. Direct payments of $11,300 were made, and the last such payment received was in July 2015. There was evidence that Montefiore spoke with Thornton regarding her private liability. A note in August 2015 indicated Thornton had signed the paperwork necessary to have her pension money redirected to Montefiore. In October 2015, Montefiore began regularly receiving Thornton's pension and her social security. There was testimony that this is done by many residents because "it's just easier for them" and then "[t]hey don't have to pay it on their own" because "[i]t just comes to Montefiore." The total amount Montefiore claimed due and owing on Thornton's account was $22,294.11.

{¶ 23} Fields offered credible testimony demonstrating that as Thornton's attorney in fact, she assisted Thornton with her banking needs and made account withdrawals and transfers at Thornton's instruction and direction, and that Thornton controlled what happened with the funds. Some withdrawals from Thornton's bank account correlated directly with payments made to Montefiore; others did not. The record reflects the other withdrawals and transfers were in the amount $18,389, including $5,592 in cash withdrawals and $12,797 in transfers made to Fields's own bank account, one telephone transfer, and two ATM debits.

{¶ 24} Although Fields had no record or receipts pertaining to the other funds that were withdrawn or transferred, Fields testified she "would do whatever was directed [of] me by Ms. Thornton." There was a note in June 2015 stating that Fields would be dropping off a $4,000 check. Evidence demonstrated that the $4,000 was withdrawn from Thornton's bank account, but the funds were later redeposited at Thornton's direction, less cash received of $460. Fields testified that when she took the $4,000 check to Thornton, Thornton told her she was "not doing that" and she needed the money in order "to go back home" and to "get [her home] together." There was evidence to corroborate the redeposit of the funds.

{¶ 25} Fields could not say what exactly the funds were used for; however, she maintained the funds were used for and on behalf of Thornton. She testified that she "did as directed" by Thornton and that at Thornton's direction, "[a] large chunk of cash I would take to her in the nursing home, and then she would go out or send individuals to do different * * * things for her, then she would have it." Fields

would usually try to have Thornton sign the withdrawal slip, but Fields did not always get her signature. She stated "[o]ccasionally, when we were out, we'd stop by the bank" and that "[Thornton] had cash always in the nursing home * * *."

{¶ 26} Fields testified to Thornton's spending habits. She indicated there were various things that Thornton asked for, from a bar of soap to decorations and items on her Christmas list. Fields explained she "did as directed" and "[Thornton would] say, I want you to do this. She would write out her list of the different things." When things were delivered, the receipt would be "in the bag" given to Thornton. Fields also testified that Thornton did not use any of the facility's items and that she had her own television, phone, clothes, and "everything else." Thornton also had "the social center at the facility that were not covered in facility costs" and "there were multiple things that she was doing." She took care of her personal hygiene, bought her groceries, would offer to buy lunch, and bought gifts for others. Fields testified that some funds were used for "doing things around [Thornton's] house" and that the idea was "that she would come out of the facility and go back to normal living." When asked for more specific information, Fields indicated she "would have to refer to Ms. Thornton" and she "was following her instructions." Fields acknowledged she "should have kept better records." The home was eventually foreclosed.

{¶ 27} Fields testified she felt like Thornton's personal concierge and that the transfers were made to her account because she explained to Thornton that she could not keep going to the bank. Fields denied using any of Thornton's money for

Fields's personal use and testified to using $7,000 of her own funds toward Thornton's expenses.

{¶ 28} Montefiore argues that its burden was met in this case because the record demonstrates the transfer of $18,389 from Thornton to Fields, several badges of fraud exist, and Fields failed to present evidence to demonstrate that the transfers were made in good faith and for reasonably equivalent value. The proof of indicia or badges of fraud may give rise to an inference or presumption that shifts the burden and makes it incumbent upon the transferee to come forward with proof and explain the bona fides of the transaction. *Cardiovascular & Thoracic Surgery, Inc. v. Di Mazzio*, 37 Ohio App.3d 162, 166, 524 N.E.2d 915 (5th Dist.1987), citing 24 Ohio Jurisprudence 3d 559, Creditors' Rights, Section 884 (1980); *In re Harper*, 132 B.R. 349, 353 (Bankr.S.D.Ohio 1991). The defense provided under R.C. 1336.08(A) provides that "[a] transfer * * * is not fraudulent under [R.C. 1336.04(A)(1)] against a person who took in good faith and for a reasonably equivalent value * * *." R.C. 1336.04(A)(1) merely codifies one way to defend the action, and "simply because appellees failed to satisfy the requirement of R.C. 1336.08(A) of reasonably equivalent value, 'does not mean they did not rebut the presumption' that the transfer of the deed was fraudulent." *Van Dyne v. Cortez*, 5th Dist. Perry No. 14-CA-00030, 2015-Ohio-3070, ¶ 28, quoting *Witschey, Witschey & Firestone Co., L.P.A. v. Daniele*, 9th Dist. Summit No. 26811, 2013-Ohio-5724, ¶ 11. "'The ultimate burden of proof in fraud cases rests with the party asserting fraud.'"

*Witschey* at ¶ 11, quoting *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc.,* 87 Ohio App.3d 644, 651, 622 N.E.2d 1113 (10th Dist.1993).

{¶ 29} In its decision, the trial court reviewed the requirements for a fraudulent transfer under R.C. 1336.04 and 1336.05. Upon considering the facts and circumstances presented in this case, as reflected in the statement of facts, the trial court found Montefiore failed to prove the assets were fraudulently transferred, stating as follows:

> Defendant testified that in over $18,000.00 in withdraws and transfers, all were made at the direction of Thornton and given to Thornton or used for her benefit. Defendant testified that, because Thornton didn't use many of the facility's features, Thornton would direct her to make withdrawals in furtherance of Thornton's care. Defendant recalled Thornton using these funds for groceries, decorations, television, phone, and social activities that were not included in Plaintiff's facility costs.
>
> Plaintiff introduced no evidence to suggest that any of the withdrawals or transfers were made for Defendant's benefit. Contrarily, Defendant testified that she did not use any of Thornton's money for her own personal use. Defendant testified that after resident Thornton signed her OPERS check over to Plaintiff, Defendant began using her own money to support Thornton, including $7,000.00 in burial expenses.

{¶ 30} Although Montefiore takes issue with some findings by the trial court, the trial court did not impose any improper burden upon Montefiore. We recognize that under R.C. 1336.04(A)(1), the plaintiff's burden is to establish the fraudulent intent of the debtor, not the transferee. However, the transferee's intent is relevant in establishing a good faith defense. Here, the trial court commented upon the proof and testimony demonstrating the bona fides of the withdrawals and transfers and rebutting any inference of a fraudulent transfer.

{¶ 31} We acknowledge the dissent's position and the inferences that may be raised by the nature of the bank-to-bank transfers completed by Fields. We also recognize the concerns raised by the dissent. However, we ultimately cannot conclude the decision of the trial court is against the manifest weight of the evidence.

{¶ 32} Although documentary evidence certainly would have been helpful to establish the expenditures made by Thornton, Fields provided credible testimony to explain the bona fides of the transactions. It appears Thornton spent two years in the skilled nursing facility. The record reflects that Thornton was a competent woman who was in control of her payments to Montefiore and of her own funds and spending habits. Fields's testimony demonstrated that she acted in good faith and at the direction of Thornton. Fields credibly testified to using some of her own money to support Thornton, including for her burial expenses. Montefiore failed to ultimately prove its claim of fraudulent transfer under either R.C. 1336.04 or 1336.05 in view of the facts and circumstances of the case.

{¶ 33} Upon weighing the evidence and all reasonable inferences and considering the credibility of witnesses, we are unable to find that the trial court's judgment in favor of Fields on the claim for fraudulent transfer is against the manifest weight of the evidence. This is not the exceptional case in which the evidence weighs heavily against the trial court's judgment. We find no merit to any other argument raised. The second assignment of error is overruled.

{¶ 34} Under the third assignment of error, Fields argues the trial court erred in finding Montefiore failed to prove its statutory claim pursuant to R.C.

1337.092(B). In the complaint, Montefiore claimed that "[w]hile acting as attorney-in-fact for Hazel Thornton, Defendant Faye Fields failed to properly manage the financial and personal affairs of Hazel Thornton and to pay the just debts of Hazel Thornton as they came due."[4]

{¶ 35} Pursuant to R.C. 1337.092(B), "[a]n attorney in fact is not personally liable for a debt of the attorney in fact's principal" unless, as relevant here, "[t]he negligence of the attorney in fact gave rise to or resulted in the debt," or "[a]n act of the attorney in fact that was beyond the attorney in fact's authority gave rise to or resulted in the debt." R.C. 1337.092(B)(3) and (4).

{¶ 36} "A power of attorney is a written instrument authorizing an agent to perform specific acts on behalf of his principal." *Testa v. Roberts*, 44 Ohio App.3d 161, 164, 542 N.E.2d 654 (6th Dist.1988), citing *Trenouth v. Mulroney*, 124 Mont. 499, 227 P.2d 590 (1951). "[A]n agent 'may not make gratuitous transfers of the principal's assets unless the power of attorney from which the authority is derived expressly and unambiguously grants the authority to do so.'" *Temple v. Temple*, 2015-Ohio-2311, 38 N.E.3d 342, ¶ 29 (3d Dist.), citing *MacEwen v. Jordan*, 1st Dist. Hamilton No. C-020431, 2003-Ohio-1547, ¶ 12.

{¶ 37} Upon considering the testimony and evidence in this matter, the trial court found Montefiore failed to prove its statutory cause of action under R.C. 1337.092(B), stating as follows:

---

[4] Although Fields raises an issue of standing, citing R.C. 1337.36, because the assignment of error is otherwise overruled, we do not address this issue.

Here, Plaintiff alleges Defendant was negligent and/or committed unauthorized acts. Defendant testified that she did exactly as resident Thornton directed her while attempting to ensure resident Thornton's safety and comfort. Plaintiff was unable to produce any evidence that showed Defendant went outside of resident Thornton's authorization. Further, Plaintiff failed to provide a preponderance of evidence showing Defendant was negligent in her duties or that any negligence resulted in Thornton's debt.

{¶ 38} Montefiore argues that Fields withdrew funds while she was aware a debt was owed to Montefiore and Thornton was on Medicare. Our review shows that Fields testified that Thornton "was still able to make all her decisions, even her hospice care." Montefiore had a conversation with Fields about redirecting her funds, and she did. Fields testified she acted pursuant to Thornton's direction and the funds were used for Thornton's benefit. Although receipts were not maintained, Fields testified the funds were withdrawn and/or transferred for and on behalf of Thornton.

{¶ 39} We are not persuaded by any other arguments raised by Montefiore. Upon our review, we are unable to find that the trial court's judgment in favor of Fields on the statutory claim under R.C. 1337.092(B) is against the manifest weight of the evidence. Montefiore's third assignment of error is overruled.

{¶ 40} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., CONCURS;
EILEEN T. GALLAGHER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE OPINION


EILEEN T. GALLAGHER, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 41} I concur with the majority's resolution of the first and third assignments of error. However, I respectfully dissent from the majority's resolution of the fraudulent transfer allegations set forth in Count 2 of the civil complaint. In my view, the nature of the bank-to-bank transfers completed by the defendant during the relevant time periods were troublesome and raised serious inferences of fraud. In this case, the evidence presented at trial demonstrated that money was transferred to the defendant, the debtor's goddaughter, in exchange for little or no consideration during a period of time where Thornton was incurring substantial debts during her stay in the Montefiore home. In addition, the defendant testified that Thornton retained control over the money placed in the defendant's accounts and directed the defendant how to use the funds. *See* R.C. 1336.04(B).

{¶ 42} As recognized in the majority decision, the proof of badges of fraud may give rise to an inference or presumption that shifts the burden and makes it incumbent upon the transferee to come forward with proof and explain the bona

fides of the transaction. In this case, I agree that it was not unreasonable for the defendant to make cash withdrawals from Thornton's personal bank accounts in order to make purchases and pay debts on Thornton's behalf. In my view, however, the defendant did not establish why it was necessary to deposit $12,797 of Thornton's money directly into her own personal bank account in order to carry out her duties as Thornton's attorney-in-fact. Any debts paid or money used on Thornton's behalf could have been completed by the defendant without placing Thornton's money into her own personal accounts. I understand that the defendant believed it was more convenient to transfer Thornton's funds in order to avoid frequent trips to Thornton's bank. However, a substantial amount of money was placed in the defendant's bank accounts and an accounting of the commingled funds was required to determine whether the funds were transferred in good faith and for convenience, or whether the funds were transferred and left unused in order to avoid the debts owed to Montefiore. In the absence of clear and convincing documentary evidence demonstrating that the full value of the money transferred was actually utilized in a manner consistent with the best interests of Thornton, I would find Montefiore presented sufficient evidence to support its allegations in Count 2 as it pertains to the bank-to-bank transfers.

{¶ 43} It is my belief that the defendant's self-serving testimony was not sufficient to satisfy the shifted burden of proof. To allow an attorney -in-fact to place money into his or her personal bank accounts without sufficient accounting may result in untenable scenarios in analogous situations where potentially fraudulent

conduct may go unchecked. Debtors would be permitted to transfer assets into the personal accounts of their representatives in order to avoid outstanding debts without providing documentary evidence to establish whether those funds were, in fact, transferred and used in good faith.

{¶ 44} Accordingly, I would sustain the second assignment of error, in part.